Exhibit A

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| STATE OF ALASKA,<br><br>    Plaintiff/Counterclaim Defendant,<br><br>vs.<br><br>ALASKA STATE EMPLOYEES ASSOCIATION/AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES LOCAL 53, AFL-CIO,<br><br>    Defendant/Counterclaimant. | |
| ALASKA STATE EMPLOYEES ASSOCIATION/AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES LOCAL 53, AFL-CIO,<br><br>    Third-Party Plaintiff,<br><br>vs.<br><br>MICHAEL J. DUNLEAVY, in his official capacity as Governor of Alaska; KEVIN G. CLARKSON, in his official capacity as Attorney General of Alaska; KELLY TSHIBAKA, in her official capacity as Commissioner of the Alaska Department of Administration; and STATE OF ALASKA, DEPARTMENT OF ADMINISTRATION,<br><br>    Third-Party Defendants. | Case No. 3AN-19-09971CI |

## <u>TEMPORARY RESTRAINING ORDER</u>

I.        **INTRODUCTION**

The State of Alaska filed this lawsuit on September 16, 2019 against the Alaska State Employees Association (ASEA). The State alleges a single claim: a request by the State for declaratory judgment – i.e., that this court decide – whether Alaska Attorney General Kevin Clarkson is correctly interpreting a 2018 U.S. Supreme Court case, *Janus v. American Federation of State, County, and Municipal Employees, Council 31*.[1] Briefly stated, in *Janus* a union of public-sector employees collected "agency fees" from public employees who were not union members, without first having them sign a consent form. "Agency fees" are fees charged to non-union employees to compensate the union for benefits these nonmembers receive from the union's collective bargaining efforts on behalf of union and non-union members (such as wage increases, paid personal days, or health insurance packages for all the employees). Union members pay full fees, whereas non-members may opt out and pay less than full dues if that employee does not wish to support other, non-collective bargaining union activities (such as political lobbying). Agency fees, prior to *Janus,* were used as a way for public employees' unions to maintain adequate funding despite the "free rider" problem (the idea that when a valuable service can be obtained either for free or at a cost, no rational actor will pay for it). This procedure had been approved by the Supreme Court 41 years prior in *Abood v. Detroit Board of Education.*[2] The 2018 *Janus* decision overruled the 1977 *Abood* decision. The Supreme Court expressly held in *Janus* that "this procedure violates the First Amendment and cannot continue." The Court further expressly stated

---

[1] 138 S.Ct. 2448 (2018).
[2] 97 S.Ct. 1782 (1977).

that no fees may be deducted from a nonmember's wages, "nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay," and that "by agreeing to pay, nonmembers are waiving their First Amendment rights, and such a waiver cannot be presumed." Rather, the Court held – again expressly stated—that "to be effective, the waiver must be freely and voluntarily given and shown by 'clear and compelling' evidence," and that "unless employees clearly and affirmatively consent before any money is taken from them, this standard cannot be met."[3] Just before this holding, at footnote 27, the Court expressly stated that "States can keep their labor-relations systems exactly as they are – only they cannot force nonmembers to subsidize public-sector unions."

That is the holding of *Janus.* It is a short and succinct holding, and is stated in the last paragraphs of the decision. This court has used the word "expressly" several times in the above paragraph to point out that that is what the Supreme Court actually said. The Court issued its *Janus* decision fifteen months ago, on June 27, 2018.

In this case now filed by the State in this Alaska superior court, all parties agree that almost immediately after *Janus* was issued in June 2018, ASEA changed its dues collection process to comply with *Janus*, and that the change included rewriting the form employees sign. The form now includes a signed statement from the employee that he/she agrees to join the union and to have those dues deducted from his/her paychecks. Membership is not a condition of employment, and employees must sign the form if they wish to join the union. If an employee does not join the union, he or she will not be charged any dues or fees. Members have ten days every year to opt out of the

---

[3] *Janus,* 138 S.Ct. at 2486.

union and payment of dues. The employees affirmatively print, sign their names and date the forms. The form is a card that states "I hereby voluntarily authorize my Employer to deduct [union dues] from my pay... My decision... is voluntary and not a condition of my employment." This was ASEA's "Exhibit A" in this case, and this court is attaching a copy of that form to this decision.

Governor Walker's Attorney General, Jahna Lindemuth, issued a Memorandum opinion on September 7, 2018 stating that by modifying the dues authorization form and no longer charging agency fees, ASEA was in "full compliance" with *Janus*. Governor Dunleavy was seated in January 2019. Eight months later, his Department of Administration negotiated a new collective bargaining agreement with ASEA. The term of that agreement is three years. It was the product of "negotiating teams" by both the State and ASEA. The new form was then and still is being used. The State and ASEA signed the agreement on August 8, 2019. Specifically, Commissioner of Administration Kelly Tshibaka signed it, as did ASEA Executive Director Jake Metcalfe. So did the Director of the State's Division of Personnel and Labor Relations, the President of ASEA/AFSCME Local 52, all six members of the State's bargaining team, and all seven members of ASEA's bargaining team. That was fourteen months after *Janus* was decided, and eleven months after AG Lindemuth's Opinion.

Then on August 27, 2019, current AG Kevin Clarkson issued his own Opinion Letter "Re: First Amendment rights and union due deductions and fees." He does not dispute the U.S. Supreme Court's *express* language quoted above. Rather, he writes that he has decided that *Janus* should be interpreted more broadly, i.e., applied beyond what the Supreme Court *expressly* held. He urges that under *Janus*, the State—not

ASEA—"must" now manage the deduction of union dues from State employee's paychecks and "periodic[ally] inquir[e] into whether a public employee wishes to continue to waive—or reclaim—his or her First Amendment rights."[4] Under his interpretation, the State "must" now take charge of this process of notifying union and non-union members of their rights to opt in or out, that this is a First Amendment right, that the State must draft the form, that the State's wording must be used, and that the State alone may determine how frequently an employee should be required to reaffirm his/her union membership. ASEA's forms do it once a year. AG Clarkson says that is not "reasonable." Arguably he could deem "reasonable" to mean that an employee must reaffirm his/her commitment to the union "before being paid," i.e., every two weeks. On September 16, the State sued ASEA, and asks the superior court to decide if AG Clarkson's interpretation of *Janus* is correct. The State also began contacting union members about these issues.

ASEA filed its answer nine days later, on September 25. ASEA also filed a third-party complaint against Governor Dunleavy, AG Clarkson, and Commissioner Tshibaka. ASEA seeks declaratory judgment in its favor and, while awaiting a final judgment, a temporary restraining order and preliminary injunction to "maintain the status quo." ASEA argues that AG Clarkson's August 27, 2019 opinion goes far beyond *Janus*, and that it violates both Alaska's Public Employee Relations Act (PERA, AS 23.40.070-.230) and the August 8, 2019 collective bargaining agreement signed by the State and ASEA. ASEA argues that AG Clarkson's opinion, and now the Governor's and the

---

[4] Kevin G. Clarkson, Opinion Letter Re: First Amendment rights and union due deductions and fees, August 27, 2019, at 10.

Commissioner's actions since August 27, are not supported by *any* court that has ruled

on this issue, and that all Attorneys General from around the country, all arbitrators, and

all labor boards that have considered this, have found that *Janus* is a narrow opinion. In

other words, that AG Clarkson's August 27 opinion finds no support in the law.

Specifically, since *Janus* was decided, fifteen opinions from States' Attorneys General,

nine federal court decisions, two administrative agency decisions, and two arbitration

awards, have found that the holding of *Janus* is narrow and easily stated: "neither an

agency fee nor any other payment to the union may be deducted from a nonmember's

wages, nor may any other attempt be made to collect such a payment, unless the

employee affirmatively consents to pay." ASEA attaches copies of many of these

decisions as Exhibits A-V to the Declaration of Molly C. Brown submitted with its

September 26, 2019 TRO application. ASEA further argues that not only have these

authorities interpreted *Janus* as ASEA now seeks, but that *no* legal authority has

interpreted *Janus* as AG Clarkson now seeks. And the State, in its very thorough

October 2, 2019 brief filed in opposition to ASEA's TRO application, never mentions this

legal framework, let alone disputes ASEA's exhibits or this part of ASEA's argument.

Nor does the State's October 2 brief dispute that the express words in *Janus* do not say

anything more than what this court quoted in the first paragraph of this decision. As

discussed below, the facts of *Janus* were not the facts now presented by AG Clarkson

(that the State, not the union, "must" control this process). The Supreme Court's

analysis did not even reach this argument. And, the express holding did not order that

States must (or even may) take over this process.  ASEA further argues that the State is

using the First Amendment argument discussed in *Janus* to now try to manage or

discourage union membership in a manner contrary to Alaska's Public Employee Relations Act.[5]

Both parties acknowledged at the September 27 scheduling hearing that the issue now before this court is purely legal, that no evidentiary hearing is needed, and that oral argument is waived unless this court has any questions not addressed in the briefs. The briefs by both parties are excellent and address all questions. This court agrees with the weight of authority on this matter: *Janus* does not support the State's position. As to whether a TRO should issue, the State has not been shy about its intentions: via its September 26 Press Release (a copy of which ASEA filed with this court), as well as orally at the September 27 hearing, that absent court order the State fully intends to continue its actions. ASEA said at the September 27 hearing that the State could have whatever time the State wanted to further brief this issue if the State would simply agree to stop trying to mandate this dues process. The State expressly declined that offer. The State then filed a 50 page, very thorough brief on October 2, which again makes clear that the State intends to forge ahead with its actions. This court finds that the State's actions are causing and will continue to cause irreparable harm to ASEA and, thus, this court hereby **GRANTS** ASEA's application for a temporary restraining order. The scope of the TRO is stated at the end of this decision.

---

[5] AS 23.40.110, entitled "Unfair labor practices," states at sections (a)(1)-(3) that a public employer (here, the State), "may not (1) interfere with, restrain, or coerce an employee in the exercise of the employee's rights guaranteed in AS 23.40.080; (2) dominate or interfere with the formation, existence, or administration of an organization; (3) discriminate in regard to hire or tenure of employment or a term or condition of employment to encourage or discourage membership in an organization…"

## II.   **STATUTORY FRAMEWORK**

Alaska's Public Employment Relations Act ("PERA")[6] establishes a system of union representation for state employees. Under PERA, a majority of employees in a bargaining unit may, if they choose, select a union representative to negotiate and oversee a collective bargaining agreement for their unit.[7] The largest bargaining unit of Alaska State employees is the General Government Bargaining Unit, which is composed of approximately 8,000 State employees.[8] The General Government Bargaining Unit is represented by ASEA. PERA requires that public employers such as the State must deduct union dues from a public employee's pay when the employee has authorized those deductions in writing, and further states that the public employer shall deliver the dues to the union.[9]

To become a member of ASEA, a member of the General Government Bargaining Unit must voluntarily sign a written membership agreement authorizing the union to collect dues through payroll deductions in exchange for membership rights and benefits.[10] ASEA's current membership and dues authorization card explains that the dues authorization is valid "for a period of one year from the date of execution or until the termination of the collective bargaining agreement...and for year to year thereafter unless [the state employee] give[s] the Employer and the Union written notice of

---

[6] AS 23.40.070-.230
[7] AS 23.40.080-.100.
[8] ASEA's Counterclaim and Third-Party Complaint, at 7.
[9] AS 23.40.220.
[10] ASEA's Counterclaim and Third-Party Complaint, at 7.

Temporary Restraining Order
*State of Alaska v. ASEA/AFSCME Local 52, AFL-CIO*, 3AN-19-09971CI

revocation not less than ten (10) days and not more than twenty (20) days before the end of any yearly period."[11]

Under PERA, if public employees choose to be represented by a union, the public employer must "negotiate in good faith" with the union.[12] As part of this duty to bargain in good faith, PERA prohibits public employers from making unilateral changes to wages, hours, and other terms and conditions of employment.[13] After a tentative agreement is reached, the legislature reviews the terms of the agreement and implicitly ratifies the agreement by appropriating funds to cover the agreement's monetary terms. The resulting collective bargaining agreement (CBA) is binding on the public employer.[14] PERA explicitly prohibits the State and other public employers from "interfer[ing] with, restrain[ing], or coerc[ing] an employee in the exercise of the employee's rights guaranteed in [PERA]", and from "interfer[ing] with the formation, existence, or administration of a[] [labor] organization."[15]

ASEA and the State are parties to a CBA that governs the terms and conditions of employment for bargaining unit employees. The current CBA is effective from July 1, 2019 through June 30, 2022. The CBA was the product of extensive negotiations, and was signed by seventeen individuals representing both ASEA and the State of Alaska—including the Commissioner of the Department of Administration (and now Defendant-in-Counterclaim), Kelly Tshibaka. ASEA attached a copy of that agreement as Exhibit B to the Declaration of Jake Metcalfe filed with its September 26 brief. The agreement

---

[11] Declaration of Jake Metcalfe, Exhibit A.

[12] AS 23.40.250(1); *see also* AS 23.40.070, .110(a)(5).

[13] *Alaska Cmty. Colleges' Fed'n of Teachers, Local 2404 v. University of Alaska*, 669 P.2d 1299, 1305 (Alaska 1983).

[14] AS 23.40.210.

[15] AS 23.40.110(a)(1)-(3).

states in pertinent part that "bargaining unit members may authorize payroll deductions in writing on the form provided by the Union."[16] The CBA incorporates language from PERA, and further states that "[u]pon receipt by the Employer of an Authorization for Payroll Deduction of Union Dues/Fees dated and executed by the bargaining unit member… the Employer shall" deduct union dues each pay period and forward those dues to ASEA.[17] Mirroring AS 23.40.110, the CBA also prohibits employer interference in the relationship between ASEA and its members.[18]

### III.   THE *JANUS* DECISION

The relationship between a public employer and public employees' unions is governed in large part by federal case law. In the recent *Janus* case, the Governor of Illinois brought an action seeking a declaration that an Illinois statute authorizing public-sector unions to assess "agency fees" from nonmember public employees, on whose behalf the union negotiated with the State of Illinois for pay and other benefits, violated the First Amendment. Mr. Janus was a public employee who joined the suit because he did not want to be a member of the union nor want the union negotiating on his behalf. The federal court dismissed the Governor due to the Governor having no standing to bring the suit. Mr. Janus was then the main plaintiff. On eventual appeal to the U.S. Supreme Court, that court held that charging agency fees violated the free speech rights of nonmembers by compelling them to subsidize private speech on matters of "substantial public concern."[19]

---

[16] ASEA CBA Art. 3.04.A.
[17] *Id.*
[18] *Id.* at Art. 3.01.
[19] *Janus*, 138 S.Ct. at 2476.

The *Janus* decision overturned the 1977 *Abood* case mentioned above, and a large part of the Court's decision discussed the principal of *stare decisis*. The *Janus* majority decision is 38 pages long. The facts were as set forth above. Put another way, the facts at issue were *not* whether the State of Illinois could control the union dues collection process. That was simply not a fact in the case. The Court's holding is set forth at the very end of that decision, and is quite succinct.[20]

Now at issue in this Alaska case is whether this court should interpret the Supreme Court's 2018 decision by its succinct holding (as argued by ASEA), or broadly (the State's position). ASEA supported its Motion for Temporary Restraining Order and Preliminary Injunction with two declarations: one from ASEA's counsel, Molly C. Brown, and the second from ASEA's Executive Director, Jake Metcalfe. Ms. Brown's Declaration attaches as Exhibits A-V 22 documents interpreting *Janus*—17 opinions from States' Attorneys General, one order from a state trial court, two administrative decisions, and two arbitration awards. ASEA also cites in its motion to nine federal court decisions. Each and every one of these authorities has found that the holding of *Janus* is narrow and easily stated: "Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay." [21] That language comes directly from the *Janus* holding. This court notes that one of the Attorneys General's opinions was from the Illinois AG, i.e., the state from which *Janus*

---

[20] This court quoted the *Janus* holding above, at pages 2-3 of this decision.
[21] *Janus*, 138 S.Ct. at 2486.

Temporary Restraining Order
*State of Alaska v. ASEA/AFSCME Local 52, AFL-CIO*, 3AN-19-09971CI

arose. Even that Attorney General acknowledges that *Janus* is a narrow decision that applies only to collecting agency fees from non-union members.

In each of the federal cases, at issue was whether the state or county employer was properly interpreting *Janus*, and whether *Janus* was applicable to the relationship between unions and their members. Every one of those decisions expressly rejected the idea that *Janus* goes farther than addressing agency fee arrangements.[22] Three state and local administrations have tried to extend the *Janus* opinion to require existing union members to regularly "opt-in" to pay union dues or to stop making previously authorized union membership dues deductions. Courts and administrative agencies have rejected each of those arguments, and have entered temporary restraining orders and injunctions.[23] An order by a Montana court is most illustrative of the facts currently

---

[22] *See, i.e., Anderson v. SEIU Local 503,* __ F.Supp.3d __, 2019 WL 4246688, at *3 (D.Or. Sept. 4, 2019); *Seager v. United Teachers Los Angeles,* 2019 WL 3822001, at *2 (C.D. Cal. Aug. 14, 2019) (following the "growing consensus of authority on the issue" in rejecting "First Amendment claim[s] for return of dues paid pursuant to [plaintiff's] voluntary union membership agreement"); *Smith v. Superior Court, Cty. Of Contra Costa,* 2019 WL 6072806, at *1 (N.D. Cal. Nov. 16, 2018), *subsequent order, Smith v. Bieker,* 2019 WL 2476679, at *2 (N.D. Cal. June 13, 2019) ("*Janus* did not concern the relationship of unions and members; it concerned the relationship of unions and non-members."); *Belgau v. Inslee,* 2018 WL 4931602, at *5 (W.D. Wash. Oct. 11, 2018) ("*Janus* says nothing about people [who] join a Union, agree to pay dues, and then later change their mind about paying union dues."), *subsequent order,* 359 F.Supp.4d 1000, 1016 (W.D. Wash. 2019); *Babb v. Cal. Teachers Ass'n,* 378 F.Supp.4d 857, 877 (C.D. Cal. 2019) ("Plaintiffs voluntarily chose to pay membership dues in exchange for certain benefits, and '[t]he fact that plaintiffs would not have opted to pay union membership fees if *Janus* had been the law at the time of their membership does not mean their decision was therefore coerced.'); *O'Callaghan v. Regents of Univ. of Cal.,* 2019 WL 2635585, at *3 (C.D. Cal. June 10, 2019) ("[N]othing in *Janus's* holding requires unions to cease deductions for individuals who have affirmatively chosen to become union members and accept the terms of a contract..."); *see also supra,* note 26.

[23] *See Montana Fed'n of Public Emps. V. Vigness,* No. DV 19-0217, Order Granting PI at 9-11 (Mont. D. Ct. Apr. 11, 2019) ("*Janus'* application is limited to nonmembers' payment of fees"); *In re Woodland Township Bd. Of Educ., and Chatsworth Educ. Ass'n,* No. CO-2019-047, 45 NJPER ¶ 24, 2018 WL 4501733 (N.J. Pub. Emp't Relati0ons Comm'n Aug. 31, 2018) (*Janus* "does not mandate members... to authorize 'dues deductions' after having done so previously"); *AFSCME, Local 3277 v. Rio Rancho,* PELRB No, 113-18, TRO and PI ¶ 7 (N.M. Pub. Emps. Lab. Relations Bd. Aug. 21, 2018) ("The *Janus* Decision is narrowly written with its effects limited to payments by non-members of an 'agency fee' or 'fair share' fee; it has no application to the payment of dues by members of the union or the use of payroll deduction of those dues.").

before this Alaska court. That case is *Montana Fed'n of Public Emps. V. Vigness,*[24] and the union was asking the court to issue a preliminary injunction. The County advanced the position that *Janus* "required" the county employees' union to mandate that its new members sign a waiver of rights before the County would withhold union dues from paychecks, and that the decision to require the affirmative waiver of rights was not subject to collective bargaining.[25] The court found that the County's arguments were contrary to the line of authority emerging post-*Janus*, and that "the County's interpretation of *Janus* to require potential new employees wishing to join the union to sign a waiver of rights appears to be an unreasonable expansion of the United States Supreme Court's holding."[26] The court issued a preliminary injunction in favor of the union and against the County.

## IV.   **THE STATE'S POSITION**

AG Clarkson's August 27, 2019 Opinion seeks to go even further than any of the above cases. AG Clarkson seeks to put the State in charge of—or at least be a main player in—the dues collection process. But more than that, AG Clarkson's interpretation is that the State gets to draft the notices, select the words in those notices, and establish the time periods for "re-upping." Indeed, AG Clarkson states that per *Janus,* the State "must" do this, "to protect state employees' rights." AG Clarkson takes the position that the State must "warn" union employees that by paying union dues they are "waiving" their First Amendment rights, and that they need not do so. In ASEA's September 25, 2019 36-page Answer and Third-Party Complaint, as well as in ASEA's

---

[24] *Montana Fed'n of Public Emps. V. Vigness*, No. DV 19-0217, Order Granting PI at 9-11 (Mont. D. Ct. Apr. 11, 2019).
[25] *Id.* at 6.
[26] *Id.* at 9.

47 page brief of that same date, ASEA hit this issue squarely on the head, and included the Exhibits A-V mentioned above (copies of AG opinions from around the country, and copies of some of the court and administrative agency decisions), as well as those attached to the Declaration of Jake Metcalfe (the form given to employees, excerpts from the ASEA Collective Bargaining Agreement, the Attorney General's Opinion, and other documents). The State filed a 50 page brief on October 1. Perhaps not surprisingly, the State attached no contrary opinions to its brief. ASEA pointed this out in its October 2 reply. Nor does the State ever discuss *as a matter of law* what weight, if any, this court must or should give to the "first" AG opinion (AG Lindemuth's) versus the "more recent" AG opinion (AG Clarkson's)—i.e., contradictory Attorneys General opinions from the same state on exactly the same issue.

## V.   DISCUSSION

The State relies somewhat heavily on two other Supreme Court cases: *Knox v. Service Employees International Union*,[27] and *Miranda v. Arizona*.[28] From these, the State asserts that the State, post-*Janus*, must now manage the deduction of union dues from State employee's paychecks and "periodic[ally] inquir[e] into whether a public employee wishes to continue to waive—or reclaim—his or her First Amendment rights."[29] This court again starts with the express wording from *Janus*. The portion of *Janus* that the State relies on is as quoted above on pages 2-3 of this decision, and again here:

---

[27] 567 U.S. 298 (2012).
[28] 384 U.S. 436 (1966).
[29] Clarkson Opinion Letter, at 10.

Temporary Restraining Order
*State of Alaska v. ASEA/AFSCME Local 52, AFL-CIO,* 3AN-19-09971CI

For these reasons, States and public-sector unions may no longer extract agency fees from nonconsenting employees. Under Illinois law, if a public-sector collective-bargaining agreement includes an agency-fee provision and the union certifies to the employer the amount of the fee, that amount is automatically deducted from the nonmember's wages. No form of employee consent is required.

This procedure violates the First Amendment and cannot continue. Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay. By agreeing to pay, nonmembers are waiving their First Amendment rights, and such a waiver cannot be presumed. Rather, to be effective, the waiver must be freely given and shown by "clear and compelling" evidence. Unless employees clearly and affirmatively consent before any money is taken from them, this standard cannot be met.[30]

In the above language, the "this provision violates the First Amendment and cannot continue" the Supreme Court refers to is made crystal clear in the paragraph—and indeed in the sentence—right above this holding. Illinois was extracting fees with no form and no consent. The Court stated that "this procedure" cannot continue, and that "affirmative consents" were required. That the scope was narrow and did not encompass other parts of the state-labor relations systems is driven home on the prior page, at footnote 27: "States can keep their labor-relations systems exactly as they are—only they cannot force nonmembers to subsidize public-sector unions."[31]

After *Janus,* the State and ASEA worked together to stop charging agency fees, and they drafted the authorization form requiring employees to consent to join the union and have dues deducted from their paychecks. Then again in the Dunleavy administration, the State and ASEA negotiated the current CBA, which at section 3.04

---

[30] *Janus,* 138 S.Ct. at 2486, citations omitted.
[31] *Id.* at 2485.

Temporary Restraining Order
*State of Alaska v. ASEA/AFSCME Local 52, AFL-CIO,* 3AN-19-09971CI

also requires employees' written consent to such dues. Now, before having union fees withdrawn, members do affirmatively sign authorization forms to have union dues withheld from their paychecks. Union members may withdraw their authorization during a ten-day window each year. A copy of this authorization form was provided to this court as Exhibit A to the Declaration of Jake Metcalfe, and is attached to this decision. This court reviewed the form. It is clearly written and easily understood. Contrary to the State's argument, this court finds that it is not confusing, ambiguous, or coercive.

As mentioned, much of the State's brief now seeks to extend two other Supreme Court cases, *Knox* and *Miranda*.

The Attorney General relies on *Knox* for his assertion that an employee must be able to opt in or out of paying union dues at will. *Knox* was decided six years before *Janus*. A public-sector union in California sent employees an annual notice that set annual dues and also a monthly dues cap. A nonmember had 30 days to opt-out of full payment of dues, but after opting-out would still have to pay an agency fee of about 56% of the full dues. One year, *after* the opt-out period ended, California public employees were sent a letter announcing a temporary 25% increase in dues and a temporary elimination of the monthly dues cap. The purpose of the special dues assessment was for the union to mount a political campaign. The Supreme Court held that opt-out arrangements for union dues are generally acceptable. However, the Court clarified that requiring union members to opt-out of paying unexpected fees which were not used for "ordinary union expenses" was constitutionally untenable.[32]

---

[32] *Knox*, 567 U.S. at 314.

Temporary Restraining Order
*State of Alaska v. ASEA/AFSCME Local 52, AFL-CIO,* 3AN-19-09971CI

*Knox* is easily distinguishable from the present case. *Knox* concerned only "the First Amendment requirements applicable to a special assessment or dues increase that is levied to meet expenses that were not disclosed when the amount of the regular assessment was set." [33] It did not find yearly opt-out plans generally unacceptable. Like *Janus*, it goes no further.[34]

Similarly, the State's reliance on *Miranda* is misplaced. *Miranda* is, of course, the well-recognized 1966 case that established a suspect's right to an attorney and to not speak to police. It is a criminal case. It is not a union dues case. In *Miranda*, the Supreme Court held that "a waiver of Fifth Amendment rights" must be "knowing, voluntary, and reasonably contemporaneous." The State in this instant case points to several post-*Miranda* cases that decided an additional aspect of this privilege: that waivers may be withdrawn or grow stale. The State cites *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Bd.,* 527 U.S. 666 (1999); *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967); *Johnson v. Zerbst*, 304 U.S. 458 (1938); *Boykin v. Alabama*, 395 U.S. 238 (1964); *Comer v. Schriro*, 480 F.3d 960 (9th Cir. 2007); and *Brady v. United States* 397 U.S. 742. But other than *Butts*, none of these

---

[33] *Id.* at 303.

[34] The State argues at pages 23-24 of their October 1 brief that "State employees... have a constitutional right to resign their membership in the Union at any time." In support of this assertion, the State cites *Janus*, *Knox*, and two additional cases: *McCahon v. Pennsylvania Turnpike Com'n*, 491 F.Supp.2d 522 (M.D. Penn. 2007), and the unreported *Debont v. City of Poway*, 1998 WL 415844 (S.D. Cal. 1998). *Knox* and *Janus* do not so hold, and neither do *McCahon* and *Debont*. *McCahon* and *Debont* both concern agreements between a state and a public employee's union to restrain union members' ability to withdraw from the union for periods of three and eight years, respectively. In these cases, this restraint on withdrawal was not articulated in any authorization form signed by the union members, so they were not able to take it into account when joining the union. In both cases, the court found at the preliminary injunction stage that, under those facts, the plaintiffs' First Amendment right not to associate was likely being violated. The facts presented in the matter currently before this court are not analogous. ASEA members are informed when signing the dues authorization form that their membership will continue from year to year unless they choose to opt-out during an annual ten-day window. Furthermore, in *McCahon*, continued membership in the union was a condition of employment, which it is not in this case.

cases contain any reference to the First Amendment right to free speech. And in *Butts,* the reference is at best tangential. Rather, most of these cases present questions of criminal law or the waiver of due process rights, and in each case the Court considered whether the coercive power of the state had been exercised in such a manner that a waiver of Fifth, Sixth, or Fourteenth Amendment rights could not have been knowing and voluntary. The Court does not, in any of those cases, extend its holding to encompass all constitutional rights. As the *Miranda* court said, "[t]he requirement of warnings and waiver of rights is fundamental *with respect to the Fifth Amendment privilege.*"[35] These cases are not applicable or instructive in the context of union membership.

Not only is the State's new policy unsupported by applicable case law, but this court finds merit to ASEA's argument that the State's insistence that the State control the authorization forms for union dues seems likely to discourage union membership. The State's conduct—including the issuance of its September 26, 2019 administrative order—seems directly at odds with both PERA and the CBA the State signed, in that the State is "interfer[ing] with the formation, existence, or administration of a[] [labor] organization."[36] The State provides no colorable explanation for why the existing dues authorization form's annual opt-out period is not sufficient. Employer-sponsored health insurance plans, for example, typically have a once-a-year opt-in/opt-out period, and absent special circumstances such as marriage or divorce, that once-annual decision is

---

[35] *Id.* at 476 (italics added).
[36] AS 23.40.110(a)(1)-(3).

Temporary Restraining Order
*State of Alaska v. ASEA/AFSCME Local 52, AFL-CIO,* 3AN-19-09971CI

binding. Political elections are once every four years. Most contracts are not revocable at will. The State does not explain why union membership should be any different.

The State proposes that public employers may only deduct union dues for union members who sign new authorization forms created by the State after the employees receive what is essentially a "warning" that they are "waiving" their First Amendment rights and that by paying dues they may be supporting causes with which they disagree. This language is not neutral, it is not the product of any discussion between the State and ASEA, and it bypasses the legislative process set up under Title 23 of the Alaska Statutes. Indeed, it may not just "bypass" the legislative process, but directly violate PERA. There is no guarantee under the State's proposed system that the State's method and/or language would not discourage employees from joining unions. Under the Attorney General's proposal, the State could arguably require union members to reaffirm their membership every two weeks before receiving each paycheck, or the State could describe union membership in a hostile way on authorization forms it drafts. The State says that it "must" take control to protect state employees' First Amendment rights. This court finds no support for the State's argument in *Janus* or in any other U.S. Supreme Court case, in no case from any other jurisdiction, not in PERA, and not in the collective bargaining agreement.

## VI.   NECESSITY OF A TEMPORARY RESTRAINING ORDER

ASEA has moved for a temporary restraining order and a preliminary injunction. At this time, this court is only considering the issue of a temporary restraining order.[37]

---

[37] Briefing for the preliminary injunction is due October 7, 2019. Second, both parties have discussed a "reverse *Boys Markets* injunction" in the briefs received thus far by the court. For the purposes of this

A party may obtain a TRO or preliminary injunction by meeting either the balance of hardships test or the probable success on the merits standard.[38] The balance of hardships standard is appropriate, among other circumstances, where "the injury which will result from the temporary restraining order… is relatively slight in comparison to the injury which the person seeking the injunction will suffer if the injunction is not granted."[39] This standard "requires balancing the harm the plaintiff will suffer without the injunction against the harm the injunction will impose on the defendant.[40] A preliminary injunction is warranted under that standard when three factors are present: "(1) the plaintiff must be faced with irreparable harm; (2) the opposing party must be adequately protected; and (3) the plaintiff must raise serious and substantial questions going to the

---

[38] TRO, the court need not and does not decide the issue of a reverse *Boys Markets* injunction. *Boys Markets* and reverse *Boys Markets* injunctions arose under unique conditions. The Norris-La Guardia Act of 1932 (29 U.S.C. §104), prohibited federal courts from granting injunctions in labor disputes. In 1947, however, the Labor-Management Relations Act (LMRA, 29 U.S.C. §185(a)), was enacted, giving federal courts jurisdiction over lawsuits alleging violations of collective bargaining agreements. In the 1960s, the U.S. Supreme Court decided a series of cases known as the Steelworkers trilogy. At issue was strengthening the requirement for arbitration under collective bargaining agreements. *Boys Markets v. Retail Clerks Union, Local 770,* 398 U.S. 235 (1970), arose from the tension between the NLA, the LMRA, and the trend toward arbitration as the preferred mechanism for resolving labor disputes. The Court held that a federal court in LMRA §185(a) cases may issue limited injunctive relief to protect the effectiveness of arbitration agreements. The Court reasoned that, as the purpose of arbitration is to provide an expeditious mechanism for the settlement of labor disputes without resort to strikes, lockout, or self-help, that purpose is undercut where there is not an injunctive remedy available for the tactics that arbitration is designed to avoid. *Id.* at 248. Some courts have recognized "reverse *Boys Markets*" injunctions, which permit unions to obtain injunctions against employers to preserve the status quo pending arbitration of a labor dispute, if: (1) the underlying dispute is subject to mandatory arbitration; and (2) an injunction is necessary to prevent the arbitration process from becoming a "hollow formality" or "meaningless ritual." *See Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322,* 651 F.3d 176, 184 (1st Cir. 2011); *Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.,* 230 F.3d 569 (2d Cir.2000); *Niagara Hooker Emps. Union v. Occidental Chem. Corp.,* 935 F.2d 1370, 1377 (2d Cir.1991); *Lever Bros. Co. v. Int'l Chem. Workers Union,* 554 F.2d 115, 123 (4th Cir.1976). At the temporary restraining order stage, this court does not consider the propriety of a reverse *Boys Markets* injunction because the TRO will not interfere with any possible arbitration process. Nor is this court aware of either party having even filed an arbitration petition over this issue.
[39] *Alsworth v. Seybert,* 323 P.3d 47, 54–55 (Alaska 2014).
[39] *Id.,* citing *State v. United Cook Inlet Drift Ass'n,* 815 P.2d 378, 378–79 (Alaska 1991) (citations omitted) (citing *A.J. Indus., Inc. v. Alaska Pub. Serv. Comm'n,* 470 P.2d 537, 540 (Alaska 1970), *modified on other grounds,* 483 T.2d 198 (Alaska 1971); *Alaska Pub. Utils. Comm'n v. Greater Anchorage Area Borough,* 534 P.2d 549, 554 (Alaska 1975)).
[40] *A.J. Indus.,* 470 P.2d at 540.

Temporary Restraining Order
*State of Alaska v. ASEA/AFSCME Local 52, AFL-CIO,* 3AN-19-09971CI

merits of the case; that is, the issues raised cannot be frivolous or obviously without merit."[41]

This court has discussed at some length the merits of this case. The State advances a position contrary to the express wording of *Janus*, contrary to the Memorandum opinion issued by his predecessor in office, contrary to all known opinions from other States' Attorneys General, and contrary to nine federal court decisions, two administrative agency decisions, and two arbitration awards. Thus, ASEA has demonstrated probable success on the merits.

ASEA's application for a TRO also satisfies the balance of hardships standard. The injury that would result to the State from a temporary restraining order is at best relatively slight compared to the injury ASEA will suffer if no temporary restraining order is granted. The State stated at the September 27, 2019 scheduling conference that the State would not be harmed were it to cease implementing its administrative order; rather, this affects the employees who request the State to stop collecting dues from their paychecks. As the *Janus* Supreme Court noted, the Illinois governor started a similar lawsuit against the union, and the trial court found that the governor lacked standing, and he was dismissed from the lawsuit.

This situation is also of the State's creation, ASEA has urged the State to not try to inject itself into this dues collection process, and the State has refused and said it will continue to refuse ASEA's request.

---

[41] *Alsworth,* 323 P.3d at n. 45*, citing State v. Kluti Kaah Native Village of Copper Center,* 831 P.2d 1270, 1273 (Alaska 1992), and *Messerli v. Dep't of Natural Res.,* 768 P.2d 1112, 1122 (Alaska 1989)) (internal quotation marks omitted).

Conversely, ASEA stands to be genuinely injured in the absence of a TRO. The State stated that so far, eleven state employees have withdrawn their payment of monthly union dues, and no doubt the State will seek to have more state employees take this step. Any actions taken by the State to encourage individuals to stop paying union dues or to otherwise discourage union membership will cause ASEA irreparable injury. As ASEA notes at length in its counterclaim and TRO brief, this is a real injury that can't be undone and likely can't be fully compensated with money damages if the case goes to trial.

ASEA has met its burden of proving that it is entitled to a TRO, and this court hereby **GRANTS** that TRO. This court's decision today is limited solely to the temporary restraining order application. This decision does not tell any public employee who must, may, can, or can't join or leave ASEA. What this order does is preserve the status quo as this litigation proceeds.

## VII.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant/Counterclaimant and Third-Party Plaintiff ASEA's September 26, 2019 application for a temporary restraining order is **GRANTED**. The State of Alaska and third-party defendants Governor Michael Dunleavy, Attorney General Kevin Clarkson, Department of Administration Commissioner Kelly Tshibaka, and the State of Alaska, Department of Administration, and their officers, employees, servants, agents, and all others acting on their behalf or in active concert or participation with them, are enjoined from taking any actions to implement the Attorney General's August 27, 2019 opinion letter or the State's September 26, 2019 Administrative Order No. 312, and from making any changes to the State employee dues deduction practices

that were in place before the August 27, 2019 AG Opinion was issued. Given the nature of this TRO, ASEA is not required to post a bond or other security. This TRO is effective immediately.

**IT IS SO ORDERED.**

DATED at Anchorage, Alaska this 3ʳᵈ day of October 2019.

Gregory Miller
Superior Court Judge

I certify that on Oct 3, 2019
a copy of the above was emailed to:

A. Stanley
Judicial Administrative Assistant

M. Brown
T. Taylor
W. Consovoy
M. Connolly
S. Kronland
S. Wilson
M. Murray

## ASEA/AFSCME Local 52, AFL-CIO
# UNION MEMBERSHIP AND DUES DEDUCTION AUTHORIZATION
### STATE OF ALASKA GENERAL GOVERNMENT UNIT (GGU) AUTHORIZATION FOR PAYROLL DEDUCTION
COMPLETE & RETURN TO ASEA/AFSCME LOCAL 52, 2601 DENALI ST, ANCHORAGE AK 99503, FAX (907) 277-5206 OR EMAIL ASEAHQ@AFSCMELOCAL52.ORG

Yes, I choose to be a Union member of ASEA/AFSCME Local 52.

I understand my membership supports the organization advocating for my interests as a bargaining unit member and as an individual. ASEA membership and paying union dues is not a condition of employment. By submitting this form, I choose to be a union member and to pay my dues by way of payroll deduction.

| | | | |
|---|---|---|---|
| LAST NAME | FIRST NAME | MIDDLE | EMPLOYEE ID or LAST 4 SSN |
| MAILING ADDRESS | CITY | | STATE & ZIP CODE |
| PHYSICAL ADDRESS | CITY | | STATE & ZIP CODE |
| HOME/MESSAGE PHONE | MOBILE PHONE | | WORK PHONE |
| HOME EMAIL ADDRESS (Home emails are held confidential at ASEA Headquarters for Union Business only) | | | WORK LOCATION (CITY / BLDG) |
| JOB TITLE | DEPARTMENT/DIVISION | | DATE OF HIRE (MOST RECENT) |

I hereby apply or commit to maintain my membership in ASEA/AFSCME Local 52 and I agree to abide by its Constitution and Bylaws. By this application, I authorize ASEA/AFSCME Local 52 and its successor or assign, (hereafter referred to as ASEA or the "Union"), to act as my exclusive bargaining representative for purposes of collective bargaining with respect to wages, hours and other terms and conditions of employment with my Employer.

Effective immediately, I hereby voluntarily authorize and direct my Employer to deduct from my pay each pay period, regardless of whether I am or remain a member of ASEA, the amount of dues certified by ASEA, and as they may be adjusted periodically by ASEA. I further authorize my Employer to remit such amount monthly to ASEA. My decision to pay my dues by way of payroll deduction, as opposed to other means of payment, is voluntary and not a condition of my employment.

This voluntary authorization and assignment shall be irrevocable, regardless of whether I am or remain a member of ASEA, for a period of one year from the date of execution or until the termination date of the collective bargaining agreement (if there is one) between the Employer and the Union, whichever occurs sooner, and for year to year thereafter unless I give the Employer and the Union written notice of revocation not less than ten (10) days and not more than twenty (20) days before the end of any yearly period. This card supersedes any prior dues authorization card I signed.

*Payments to the Union are not deductible as charitable donations for federal income tax purposes. However, they may be tax deductible as ordinary and necessary business expenses.*

### ASEA/AFSCME LOCAL 52 BUSINESS LEAVE BANK
**I authorize the deduction of 7-1/2 hours of personal leave for deposit in the
ASEA/AFSCME Local 52 Union Business Leave Bank\*.**

| | |
|---|---|
| SIGNATURE OF GGU BARGAINING UNIT MEMBER | DATE |

\*The ASEA Business leave bank is an asset of the membership and the Union. The leave bank is used to compensate members for time lost from their regular work schedule to conduct negotiations, ASEA trainings & conventions, arbitrations, and approved activities contributing to the mission and goals of ASEA/AFSCME Local 52.

Questions? Contact ASEA (800)478-2732

REVISED 9.18.19 **Exhibit A
Page 1 of 2**

# GGU AUTHORIZATION FOR PAYROLL DEDUCTIONS

Entered _____

**COMPLETE AND RETURN TO:  ASEA/AFSCME Local 52, 2601 Denali Street, Anchorage, AK 99503
or Fax: (907) 277-5206 or Email: aseahq@afscmelocal52.org**

**PLEASE PRINT CLEARLY**

| Most Recent Date of Hire | Employee ID or Last 4 of Social Security Number | | Voter ID # |
|---|---|---|---|
| Department | Last Name · | First · | Middle |
| Division | Mailing Address | | |
| Work Location | City · | State · | Zip + 4 |
| Job Title | Physical Address | | |
| Home Phone | City | State | Zip + 4 |
| Work Phone | Home E-Mail Address    (Home e-mail will be held confidential at ASEA Headquarters and will not be distributed to anyone.) | | |

**S I G N A T U R E   R E Q U I R E D**

I hereby apply for or commit to maintain my membership in ASEA/AFSCME Local 52 and I agree to abide by its Constitution and Bylaws. By this application, I authorize ASEA/AFSCME Local 52 and its successor or assign, (hereafter referred to as ASEA or the "Union"), to act as my exclusive bargaining representative for purposes of collective bargaining with respect to wages, hours, other terms and conditions of employment with my Employer.

Effective immediately, I hereby voluntarily authorize and direct my Employer to deduct from my pay each pay period, regardless of whether I am or remain a member of ASEA, the amount of dues as certified by ASEA, and as they may be adjusted periodically by ASEA. I further authorize my Employer to remit such amount monthly to ASEA. My decision to pay my dues by way of payroll deduction, as opposed to other means of payment, is voluntary and not a condition of my employment.

This voluntary authorization and assignment shall be irrevocable, regardless of whether I am or remain a member of ASEA, for a period of one year from the date of execution or until the termination date of the collective bargaining agreement (if there is one) between the Employer and the Union, whichever occurs sooner, and for year to year thereafter unless I give the Employer and the Union written notice of revocation not less than ten (10) days and not more than twenty (20) days before the end of any yearly period. Employees must inform the Union of any promotion or transfer to a position outside the bargaining unit. This card supersedes any prior dues authorization card I signed.

Payments to the Union are not deductible as charitable donations for federal income tax purposes. However, they may be tax deductible as ordinary and necessary businesse expenses.

### ASEA BUSINESS LEAVE BANK

**I authorize the deduction of 7-1/2 hours of personal leave for deposit in the ASEA/AFSCME Local 52 Union Business Leave Bank\***

X _____

**SIGNATURE OF BARGAINING UNIT MEMBER**                          **DATE**

### Authorization for Payroll Deductions of my

### Public Employees Organized to Promote Legislative Equality (PEOPLE) VOLUNTARY CONTRIBUTION

*You may make a contribution of any amount or no contributions at all to PEOPLE.  The Union will not favor or disadvantage anyone by the level or decision to contribute.  In accordance with federal law, the PEOPLE Committee will accept contributions from only members of AFSCME and their families. Contributions to AFSCME PEOPLE are not deductible as a charitable contribution for federal income tax purposes.*

I understand that this contribution may be used for political purposes.  My contribution is voluntary.  I understand that it is not required as a condition of membership or as a condition of continued employment, and that I may revoke this authorization at any time by giving 30 days written notice.

**I AUTHORIZE THE STATE OF ALASKA TO DEDUCT THE FOLLOWING VOLUNTARY CONTRIBUTION FROM MY PAYCHECK EACH PAY PERIOD, TO BE PAID TO ASEA/AFSCME LOCAL 52 POLITICAL ACTION COMMITTEE.**

Minimum Contribution ☐ **$2.00** (Does not qualify for AFSCME MVP Rewards)

**AFSCME PEOPLE MVP Rewards Program** ($5.00 minimum contribution to qualify for the AFSCME MVP Rewards)

☐ **$5.00**      ☐ **$10.00**      ☐ $ _____   **(Any amount up to $20.00)**

X _____

**SIGNATURE OF BARGAINING UNIT MEMBER**                          **DATE**

(FORM REVISED (6.3.18 sd))          If you have questions about this form please contact ASEA at 800-478-2732

Effective 6.3.2018

**Exhibit A
Page 2 of 2**